Good morning, Your Honors. Christina Deverly Stuckmann, on behalf of the defendant in front, Mr. Sanchez-Espinoza. I believe that we're here because of footnote 19 in the case of United States v. Lopez, which was recently decided by this court on law. And in that case, Lopez considered wins as an alien smuggling offense. And it should be a simple question. And the law says it should be a law. And footnote 19 says the court will not decide exactly which facts constitute an alien smuggling on an alien event theory. And that's why we're here. And Mr. Sanchez-Espinoza, his counts on alien smuggling counts should be reversed because there is insufficient evidence linking him to the alien smuggling prior to their being dropped off on the U.S. side of the border. Cases which have considered this fact are good for Mr. Sanchez-Espinoza. Insofar as, for example, in the case of United States v. Sistine, the court did find that the defendant was an aider and abettor of alien smuggling based on these facts. The defendant called the principals who were in Canada and was looking for work. He said, I would like to participate in an alien smuggling. Do you have anyone for me? Can we do anything today? And I said, yeah, we'll send you a person today. And based on the phone conversations which were recorded, they sent an alien across the border. Mr. Singh met that person at the airport. And based on his involvement, he agreed to transport that woman all the way across the country. And then he agreed to bring her passport back to Canada. And on those facts, this court held that Mr. Singh was an aider and abettor because he induced the alien to come to the United States. But those are concepts that have to be defined. I mean, that was a perfect case. There was a perfect case, right? But it does not have to be perfect. There has to be some evidence linking a person beforehand to the entry of the aliens into the country. Lopez said very clearly. You have the coyotes who are still with the aliens, right? And they get in the van. They do get in the van. And I think what this court should look at is the fact that the liability exposure for the foot guides is wholly different than the liability of Mr. Sanchez Espinosa. In the case of the United States versus Lopez, the court did actually describe a situation where, say, for example, someone was crossing a group of aliens in the United States driving a car. And they drive right across the border, say, one mile across the border into Lopez. Lopez said, well, you know what? That would be a continuing offense of alien smuggling because it was a short distance. And it doesn't really make any sense to charge them with transporting also because it was so temporally brief and geographically close to the border. However, the conduct of Mr. Sanchez Espinosa in this case is distinct insofar as there was no evidence in this case, no hard evidence, nothing really connecting him to the aliens in Mexico, the money that was being originated or agreed to pay for. Based on the fact that the coyotes were still with them. I think that's relevant because… They weren't stopped at bus stops. No, no, no. No, they weren't. But, OK, to bring an analogy from football, the court of progress had stopped at the point where the aliens brought the… I'm sorry, the foot guys brought the aliens to the site of Interstate 8 and they hung out. They were done. They were on the same team. They were on the same team. Well, that's a good conspiracy. That's a bad one. That's a good one. Well, you know, not exactly. Well, who was it that could have been caught? The coyotes simply said they had been there with them but had not gotten into the van. But in this case, the coyotes got into the van. Right. Which they became transporters themselves at that point. Everything changed. There were different circumstances. There was a different play involved. The play of transporting commenced after… There was a stoppage time. There was a stoppage of the foreign movement of the aliens north of the border. And they waited at the side of the road for four hours before the vans arrived to pick them up and transport them in the United States. And so… How does our decision in Hernandez-Oriana affect your argument? It's a critical case for this court because, as you know, in Hernandez-Oriana, this court found that there was sufficient evidence of a conspiracy. And I'm not advocating a rule where there can never be a conspiracy. Obviously, Oriana found that if they're put based on these facts, the defendants, the women, agreed to register cars in their own names prior to delivering those vehicles to Mexico for the purpose of smuggling aliens. When investigators started looking into the case, one of the defendants had $1,600 in her purse, which is a smuggling fee. And there was testimony from the aliens that that fee was provided to her, that they saw money exchanging hands with the defendants. And a letter, an internal, were found that were written by the defendants, which stated prices, dates, trailing, smuggling, who did what, names of foot guys, names of other guys. And so, very, very clearly, there was a lot, a lot of evidence establishing that these two women were involved in overarching alien smuggling conspiracy. Of course, in their case, there doesn't have to be a lot of evidence. Well, there should be some, and there isn't in this case. Well, how about the overt acts? The overt acts, they do not include extraterritorial conduct. And I believe that that is a fatal flaw in the indictment. And in Hernandez-Oriana, there was an overt act in their indictment which alleged extraterritorial conduct. So it's a big distinguishing factor between that case and this case. Here, where the indictment did not list any extraterritorial conduct, because the government didn't have any facts to support that the defendants here were engaged in any extraterritorial conduct. There just simply was none. And the government's going to argue that, well, you know, in the ways and means, we did talk about extraterritorial conduct. But if you look at the superseding indictment, the ways and means include, on some occasions, the defendants delivering a vehicle to a location. On some occasions, transporting them within the United States. So what things require that the overt acts encompass extraterritorial conduct? Well, there's no case on point that says exactly that. However, the overt acts are the only things that the jury has to find. The jury doesn't have to consider the ways and means as part of this verdict. And so, as a result, it's crucial that the extraterritorial conduct, some link between the defendants and the extraterritorial conduct. But if the book died as a part of the conspiracy, and they led the group from Mexico into the United States, why wouldn't that be extraterritorial conduct? That was extraterritorial conduct. And the book dies. The cross, those people are liable. Their exposure is for a brain tube, very clearly. If they're part of the conspiracy. However, when Mr. Sanchez Espinosa became involved, four hours after they started waiting outside Interstate 8, his involvement commenced after the brain tube ended. Why is it clear that it ended on the side of Interstate 8, not a place where they can stay? They're there temporarily. Again, the guy found abandoned them, the guy who looked at them, the guy clearly intended to take them someplace else. It didn't appear to be an inbound stop, like a bathroom stop. Well, it's more than that. It's a change in the plan. It's a change in the personnel and the activities that are going on. What in the record says this is a change in the plan and not part of a continuous wait? There's no, I mean, there's no testimony that the plan changed, but there's no testimony that it can't. I mean, you know, there's no evidence on the other side. And I have a minute for a little. All right. Thank you. I'm going to get to my voice. I'm struggling with a cold. Vegas, this says Vegas. For newcomers. You know, I want to focus on some different issues in this case. We have a flurry of issues and we join each other's arguments. I want to focus on the district court's inclusion of federal alleged crime smuggling business and its abstruse and critical defense testimony. Testimony from a material witness whose definition tends to be one of the consultants' greatest faults. She was accused of committing a crime. Also, she overreacted. The district court admitted of overreacting to conspiracy, incriminating evidence, or alleged product smuggling incident that had nothing to do with the incident across the district. The district court was not very excited about this fact. Since we defied their argument and flashed some similarities between this case and the previous one, this was a case where the original assignment was to conduct a license on January 18th, 2007. Was it too late for you to consider this example of data unknown? You said you're on it, and I don't think it's much of it. But what I'm concerned with, and why I took this approach very carefully, is that what the government has done here to immunize those quasi-bad acts against evidence-sharing policies is laundry-listed them as overt acts in an indictment charged with conspiracy. Again, the original assignment was that. So I know the problem with this is that an overt act is an element of a conspiracy charge. But the specific overt acts are evidence of that element. Evidence and elements must be treated differently, otherwise we result in a case like this, where most of the trial is taken on proving that incidents have happened many years before, not involving the defendant, in different places, and with no connection, with no conspiratorial agreement linking them one to the other. Well, but what if you keep down from, keep evidence from being introduced, that they don't do exactly what we want them talking about? So, are you saying that these incidents were too stale to be included? Your Honor, my argument is that there was no connection between them. What's required to prove that that's a conspiracy, to prove that these acts have something to do with the conspiracy, is that they were part of a conspiratorial agreement. And that preliminary analysis, despite the felon's objections to the evidence, that preliminary analysis as to whether there was that common conspiratorial agreement was never taken, because it seemed that everybody was under their misdivination. They simply, by lifting acts in an indictment, were demonizing this man. So you made this objection to the judge? Your Honor, I was not taught how to do that. Well, the counsel made the objection to the judge. Mr. Sanchez Espinosa's counsel read the issue, and then when the issue came up and was argued before the judge, Mr. Sanchez Espinosa's counsel argued it. What was the specific argument? The argument, Your Honor, is that, actually, in the book, it was argued that this evidence was improper for any evidence, that it was really improper to show that the defendant pretended to engage in an incident. Did it make the argument about whether or not it was proper to be introduced as part of the conspiracy? Your Honor, I think that that was the interest of it, because it came at a time when the Superstition Indictment had issued, and all of these acts had been monolithic as overt acts. And counsel came in and said, Your Honor, this is called Floreen, and then you've got to call it what it is. Now we're calling it overt acts. It's the same Floreen we argued about several weeks ago under a different indictment. It's the same activity simply brought in under a different indictment to do an in-run-around rule. What was the specific argument made that these acts were not officially connected with the conspiracy? Was that the specific argument made? I believe it was, Your Honor. My memory doesn't serve me as to exactly whether it was put in those terms, but the argument was made repeatedly that the act has nothing to do with each other. And that, of course, is the argument, and that it was not intended as if these were not overt acts. If they're not part of the same conspiracy, if they're not linked by the same conspiratorial agreement, then they're simply fruitful for the evidence brought in under a different name, and that's the problem in this case. Well, the text that we use to determine if they are part of the same conspiracy, what case gives us the text? Your Honor, I believe it's Discarnation, that was the first point you made. What's the typical case that you would argue gives us the test to use to determine whether or not the evidence presented is within these conspirators? I think it's Discarnation, Your Honor. My memory was right on that. Your Honor, it would be extrinsic evidence if it's inextricably intertwined or part of a single criminal episode, or it's other acts that are necessary preliminaries to the crime charge. That's the test that this Court put out when we used Cara Martinez to finalize 66 after 1006. So, what's the end of the conspiracy case? Your Honor, what the conspiracy case was, the conspiracy case was a case about how you could have a hyperionic acid, and the issue was whether the defendant's methamphetamine could come in and be extricably intertwined in that case. And in that case, the Court felt that it could not because it didn't apply that test. It looked for that relationship, that conspiratorial agreement. Some threat that linked this prior incident to the incident that really was the process of the case, and the Court couldn't find one. Does this reflect that case, Your Honor? Absolutely. I did, Your Honor. I did reflect that case. Again, it's 66 after 1006, and it's decided both, in my opinion, that the defendant's methamphetamine did not apply. The other issue that I think is very important in this case is the second issue I want to discuss today, which is the District Court's exclusion of a material witness, a testimony, taken via the evidence deposition. It was extremely relevant and extremely expository. The key issue in this case was whether the car in which Mr. Bonilla and Mr. Sancho Descanoso were arrested was at the scene of the alien transport or not, whether it was simply a case of mistaken identity, or, as counsel argued, a case where he's been arrested before and the agents couldn't get them on other smuggling incidents in society, but here they are, they're out there, we're going to get them on this one. This testimony was extremely important because the testimony of Mr. Gardosa, the material witness testimony was excluded, was that he was offered an incentive by a border patrol agent to say that this precise car that Mr. Bonilla and Mr. Sancho Descanoso were arrested in was threatening a case of transport. The District Court determined that the defendants were irrelevant, however highly relevant. It was relevant, for one, to show the very basic fact that their car wasn't deprecated in the alien transport. Here we have a key witness who was there and who would have known, who had to be brought to say that the car was there, which implies that the car was not there. But it was also important that he was able to say that. Well, I was curious about that, because you said it implies that the car was not there. Did he say the car was not there, or did he say, were you prepared to say they were trying to coerce me to say it wasn't there? No, Your Honor. He testimonied about the flip-flop several times, which brings me to my next point. The government argued that the entire deposition was excluded. I'm not sure that's clear. I'm not sure that's what counsel thought was happening. But anyway, next, he went to the deposition. The deposition testimony makes no sense without this crucial evidence regarding the bribe of the agent, because the material witness flip-flopped back and forth several times. He says, I did see a car there, but I'm not sure it was there. Okay, your Honor, I didn't see a car there. But two agents testified that they saw the car there. Is that true? Your Honor, they saw it there, but it's very interesting. They identified that car as a Ford Focus on the dispatch, and they described it differently when they did a trial. It turns out that the car that they pulled over Mr. Bonilla, Mr. Sanchez was promoted in, was a Ford Escort. And so these were points where the government's case was weak. The material witness is still tonight. Didn't one of the defendants say, I stopped just to help him out? Your Honor, that's too strange. Mr. Bonilla, my client, was a passenger in the car. That is allegedly what he said. However, it doesn't make any sense, because he wouldn't have been the one that stopped at his interception. Well, he stopped. It seems to me he was admitting that he was there. Or your Honor, it's ambiguous. We're not sure what he meant by that. And unfortunately, the evidence in this case, fortunately for the government, it was not covered by the defense's defense, and it really turns off whether or not this car actually happened at the scene of the transport. I have 30 seconds' privacy. Well, I'm just curious if Mr. Wakefield, the defendant, he probably didn't believe him. Did the defendant call the agent? No, Your Honor. He did not call Mr. Wakefield. And that was the agent that supposedly did the inappropriate contact. That's correct, Your Honor. And I believe the material witnesses' testimony separate from whether Agent Wakefield was called, because this wasn't a testimony that was being brought on the town of Mr. Wakefield's presence. It was being put on to exhaust the defendant and the British Park area. Thank you, Your Honor. Thank you very much, Your Honor. Thank you. You know, I really like my baton. We're in a relay race in town. We've got three runners in a relay race. The third runner doesn't do anything during the first stage or the second stage. He's critical of getting to the town where we're heading to. I don't find that ironic, Your Honor. Well, with the state of the team, they get three players. And that third player, he does not know to be there and to get the time. If he did not show up earlier, it would... He would have a race going on. Exactly. The team player would want him to. And that's what we have here. No campus is absolutely clear on this. The bringing to a camp does not end until the initial transport ends into the open lawn. And, as Your Honor has pointed out, the good guys are there with the aliens. The good guys not only are there at the shoulder of the freeway. They're calling on the cell phone. Thirty minutes later, the van shows up. At least, as Your Honor has pointed out, the first four hours, it is time for the ER in regards to where she gets to in this four-hour wait time. That's not in the record, Your Honor. The record is clear that on page ER-123 and 124, that the van showed up only 30 minutes after the point that the aliens were at the shoulder of the freeway. And that's important because, as Your Honor has noted, those people are only 30 minutes away. They would be there conveniently if they had traveled to private formation with the good guys. Not only do they all serve the people who are with the van at the time, but they wait down the van after coming for the van to get there. They instruct the aliens to get into the van. After the aliens and the good guys both enter the van, they're still continuing the bringing to a van. They're still instructing them what to do. They're telling them to make out. They're telling them that the immigration check point is up ahead. They're going to have to get out of the van, and they're going to have to keep on walking. And then, when the van gets caught by Border Patrol and the driver of the van veers off the shoulder of the freeway, the good guys tell the aliens to get out of the van and start again. The bringing to a van has clearly not ended after the aliens tell them to deliver the van on the shoulder of the freeway. Singh is distinguishable in this case because in Singh, the initial smuggler who took the van from Canada into the United States dropped him off at a hotel and then left. Clearly, the initial transport has ended because the person that dropped him had left. And at the time that Singh came in, he didn't. They were at the hotel. He picked up at the hotel, and the hotel took him to the airport and then transported. They have held that connection even though the smuggler was not there because the initial smuggler was not there because of all the private contacts that they were able to show Singh. But in this case, as we all know, the two recent unpublished opinions, the Saddam case and the case. We didn't mention the unpublished opinions. I'm sorry? We didn't reference any unpublished opinions. I'm sorry, Your Honor. There are two unpublished opinions filed in the circuit. Ortiz Romero, as well as Saddam. Ortiz Romero came out in September 2008, and Saddam Hussein out in October 2008. Did you file a case? Yes, Your Honor. Can you explain to us why Agent Wakefield wasn't called? We didn't need Agent Wakefield to be called to identify whether or not the foreign exports showed up with the damage because he wasn't there. There were only two agents that were there following and noticed the damage and the export. Both of our agents filed the case, and two of them testified at trial. The defense could have called Agent Wakefield themselves. They didn't try to. If this is in regards to the motion to exclude the deposition testimony, if you look at Act No. 2, that's the government's motion to exclude the testimony. It's only excluding the fact that Agent Wakefield allegedly instructed Marshall M. Cordova on how to testify. It's not excluding Marshall M. Cordova from professing to say, I did not feel the attack. That's specific in the motion to exclude. And it's specific in the defense's response to that motion. It's in regards to Agent Wakefield's instructions. And the government argued, that's saying, just because Agent Wakefield allegedly engaged in the crime, so did Agent Peterson and Agent Todd. They essentially tried to use Agent Wakefield's contract to impeach two witnesses that the way Agent Peterson and Agent Todd testified. So they can't use Agent Wakefield's testimony or Agent Wakefield's contract to impeach the testimony of Agent Peterson and Agent Todd. And for the same reasons, the government didn't provide the deposition testimony of the material with Marshall M. Cordova. So Agent Peterson and three other material witnesses, they can't use Martinez-Cordova's testimony to impeach the material witness' testimony that did testify of Todd. So in regards to the low-tech to the low-tech issue, Hernandez-Cordova is different in that case, because the defense in that case picked up the ambulance at a low top and was deemed to bring the ambulance from the low top into the top. This court said that we can't show doing it as to those two ambulances, but there was a conspiracy. But yet, in this case, as the unpublished opinion pointed out, the low techs are still there, and that's the conviction. Is that the best authority you have to support your position, unpublished opinion? Well, no, it would be low tech. But after low tech, there are limited opinions to then interpret low tech. These two cases, although they're unpublished, both of them have low tech still being involved in the bringing them to offense. Well, I've talked to you for the other few moments, but unpublished opinions are not reported to me. So you might want to argue something else. Well, it would be low tech. Low tech is quite clear that the bringing to offense does not end until the initial transporter leaves. And I think Ms. Coutinho-Ruiz, she cited to the low tech in regards to the example, the example of an individual who just crosses the area and takes them to a mile away. That's part of page 154 of the low tech decision. But it makes more sense to think of this more unobstructed trial as prostituting a single instance of death. That's not what we have in this case, Jerome. It's not just an uninterrupted trip. They transport them via foot from Mexico into the United States, and then they stop. And they wait for the right. And so they change their approach to transportation. It's not the sense of it's only for the two. It's really two and transportation. The footage I can see why they're sort of bringing to offense, because they brought them from Mexico to the United States. They have left. They're continuing their offense, and they have now left. So they're also liable for transportation, because now they're changing their look. Now they're entering into a van and continuing on, and they're guilty for transportation. And that's why the offense in this case was found guilty for both the bringing to and the transportation of being screwed with. For the conspiracy and the over-cap service, the government does not have to show that the folks standing at the end of the day were present at all of the conspiracy. We don't have to show that they knew each other prior to January 18, 2010. What the government does have to show, though, is based on the superseding indictment. The acts were committed in furtherance of the conspiracy. And that's a question for the jury to decide whether or not the acts that they committed were in furtherance of the conspiracy. And if you look at some of the prior contacts, January 17, 2007. That was the day before these individuals were arrested. We have a van that's gutted out. It's gutted by the university, so all the animals, to preserve as many animals as possible. And they do the same exact thing they did on January 18. When they're caught, they leave the van and drive, and they start running, and animals are jumping out of the vehicle at the same time. That's exactly what happened on January 18. In September 16, 2002, that van was involved as well as another. Again, on the Interstate 8 freeway. And he's doing the same tactic. He's driving in tandem with a van, stopping on the shoulder of the freeway, one person gets out of the van and enters the other vehicle, and such does know that he's the driver of that other vehicle. That's the same thing that happens on January 18. On February 13, that's Mr. Bonilla's prior conviction. Again, he's in the van, gutted out, just so he could fit, gave in, and he turns to prevent the checkpoint. And here he comes once again. On May 26, 2004, that's the statute that he's in. That's the one that he's caught on the shoulder of the freeway, condemning him for entering his vehicle. It's hard to decide whether or not all defects are part of the conspiracy. And it certainly was admissible under the instrument in connection to the entry point of Parliament. Defects are things coming in tandem. I thought I'd like to turn to somebody else if you'd like to. I'd like you to address the adjustment that the District Court made for Mr. Sanchez on the number of aliens. It's going to be more than 100. Can you tell me how the District Court got there? The District Court adjusted Mr. Sanchez's detention on class 9 under 2.1.1b2, where the number of aliens is being 100.4. If you just look at his interrogation on September 16, May 26, January 16 and January 18, that's a comprehensive investigation. Now, the District Court's analysis was, look at the material evidence testimony provided by him. He testified that this was a team operation against another organization. He actually, in the material evidence testimony, he was part of a group that got caught before he got caught. Right, and who testified in the trial about this? He was trying to read it. That's the material evidence he testified about. He was one of those people. He was one of those people. He was testifying about his journey. So he gets smuggled in. He shows up to a hotel when he was. They take a bus through Cali. They take a taxi to a specific location near the hill, and they plop in through a guide, and they make it towards the school. That's in his case. So he also happens to be a person. They just didn't make it all the way to the school where they were treated. Was it the same group? It was the same group, and they added more. They took him back to the hotel. So when they caught him the first time, and they caught him, they went back to Mexico. What did they do? They go back to this new hotel, and they do the same thing. And he knows that this attempt to disinvolve the Empire is his? Well, we can infer from that. He should be part of the conspiracy. Part of what conspiracy? I'm sorry. You said he is part of it. Who's he? Okay. He is part of what conspiracy? In the second instance? In the second instance. Okay, so you're talking about somebody who had a failed attempt. We're talking about an alien who had a prior failed attempt, and then made a second attempt, but was successful, but was disinvolved. Right. And even though it was the second attempt, he's doing the same thing. He shows up to the same hotel, he meets the same people, he takes another bus, and drives away. Okay, and how many people would have been involved in that attempt? I believe he testified that there would be approximately 20 people. And how many of those would have been the same people who were involved in the second attempt? I believe he said only a couple additional aliens added. So did he add that to the 50? Yes, Your Honor. Because it's still too saturated. Oh, I get it. I get it. It's something else. It's something else. How did he get to 100? But the routine operation that he had, I think, is telling. Just because we have only one... How many times do you know the percentage was involved in other aliens for which we have numbers? Your Honor, he was involved with at least since September 16, 2002. And his gambling records that were interviewed show that he had lost over... Okay, now this is the problem with this. So you've alleged a conspiracy, and you were pretty aggressive about it, and you went back to 2006, and we have 4 or 5 isolated incidents, and we have 4 or 5 states that are separated by... Okay, so the number of years in which the Sanchez was involved. And we've added all of those aliens in here. So, and we don't get to 100. So the only other way to get to 100, then, is to go through his gambling records. To go through his gambling records and to... And so he lost a lot of money. And to also add in the aliens, which is another problem. And to assume that there... Or, based on the evidence from his gambling records, where he lost a lot of money, where did he get this money from? Right, maybe he wanted drugs. He didn't... In which case, you wouldn't get an enhancement for running 80 minutes, would you? No, Your Honor. But I think the evidence in this case shows that he wasn't buying drugs. That he was part of an alien smuggling operation. I understand the court's frustration. The district court believes... And our intuition as people, as opposed to our intuition as judges or as lawyers, is that this guy must be running... He's got no good belief in the courts. He's got a wife and three kids. He's making $1,600 a month. And he's gambling hundreds of thousands of dollars. We obviously know he's getting the money from someplace else. The question is, can we infer from that that it must have been agent, and therefore add in an unknown number of agents to get to $100,000? In the standard, I would argue it's a performance of the evidence, because we're working from a 16-month mandatory minimum charge. And the increase to only 3 to 18-month range is different. That's certainly not a disproportionate effect. Okay, so I guess it's a performance of the evidence as opposed to clear and convincing evidence. That's correct, Your Honor. I believe it's a performance of the evidence. Okay, that just means we've got to have at least 50%... We've got to have over 50% probability. Right, Your Honor. And based on the evidence in this case, we have him smuggling aliens. We have material that testifies about the operations of his gambling-smuggling organization. And we have some family records to prove that he's earning illegitimate income somewhere. And based on these files, we can infer, and we did infer that that illegitimate income came from his gambling-smuggling activity. And that's where the plus-nine canceling came from. And even if this court holds that that's not a correct way to come up to the plus-nine canceling, it's still a very reasonable assumption. It's 78 months. That would require an exercise of discretion by the district court as opposed to a calculation under the guidelines. That's correct, Your Honor. I believe that he properly, the district court, properly analyzed the case. And he was there as filed. He was able to listen to the material in it. He was able to listen to the testimony regarding the gambling records. And he was able to listen to all the agents that testified in regard to Mr. Sasha Testimone's private conduct. And from all of that, certainly there was evidence to show that there were at least 100 organics that Mr. Sasha Testimone was responsible for smuggling into the United States. And again, the 78-month sentence that both he and Mr. Bernier received is reasonable. And in this world, if you just smuggled three aliens through the fourth entry one time, you would get 60 months, that is very minimal, for bringing in those illegal aliens. That's not the type of defendant we have here, the defendant we have here. Both defendants have a huge history with aliens smuggling. They've been arrested in their activity. They've smuggled some aliens in a van. And they have, in this particular case, that van actually ran over an individual. And that individual got hurt. And that meant he goes to the bus to the hospital for bottom of the water. But that's already been accounted for. Right. That's just making it clear that the 72-month sentence is reasonable for both defendants. If you're honest, OK. No, I do. Just one thing that kind of got my attention is there's an issue as to whether or not the black sedan was connected to the white van. My understanding is that actually Sanchez had a key to the white van on him when he searched. Is that right? He had several keys, Robert. He had a keychain that said old white van on it. That key was tested on this particular white van. But the same keychain that tells the ex-court keys that was used in the ex-court commission has the key to the white van that showed up before an ex-court. So there was a connection between the two. Yes, Your Honor. Thank you. All right. Thank you, counsel. Rebuttal number one. Thank you. I just wanted to point out one separate thing. In preparation for this argument, I listened to this case's oral argument in Sting. In the case of Sting and the government, in that case, argued that the briefing from Canada was completed when the alien crossed the board, not when the person who was accompanying her left the hotel. So the government, in that instance, was advocating a ruling where once the alien reached the border, had just crossed the border, that's a complete offense. And we have way more than that here. So we would argue that just because the book guides are involved in transport doesn't mean that the defendants are involved in a brief too. It doesn't make any sense. You don't get a transportless, transportless, transportless phrase. That doesn't make any sense. And that's not in the law focus. Thomas has delineated fourth class offenses because it reflects the dangers associated with the different crimes. And a brief too is punished with a minimum mandatory because it's highly dangerous. And it wasn't his case. People are coming through the mountains. They're affected by weather. People have died from exposure and all kinds of other things. People are smuggled in places in the car, which are dangerous to them, in apartments. And those kinds of dangers, which are associated with a brief too, just aren't present when we put a transport. Here in the States, what we saw, the aliens crossed the border on foot, and then they were put in a car, allegedly by Mr. Santos. And the transport was a safe thing. There was no evidence that the city overreached the seating capacity of the van. Traveling by car was as dangerous an activity as crossing the mountains. All right, thank you. Thank you. Follow me. Thank you. I have three questions. I agree with one. First of all, as a survivor, all you want to do is do a model one and consider any objections to the other acts of testimony. And that's what comes up, is that there Second, the government can decide if you were offered for an impeachment thing or not. If you were offered, there's evidence that the cause of the message was a terrible intention. Third, the government's contention that it can offload preliminary evidence or analysis to the jury can be wrong. That's a dispute for assumption. That's a terrible case. Putting it into judgment does not mean that you disagree. First of all, it's the initial goal of the case is to infer extremely prejudicial evidence. And finally, a factual question. If he was found before us for a couple months later, another government agent testified that this was unusual. It's typically evidence of inventory right away if he was gone, and not just discovered in some way today. So these are all, I think, problems the court should look at in the wrong cases. If we have a little more time to do that, I'm too quick to talk. Actually, the red means you're over. I was going to close in on that. Thank you very much for your time. Thank you. Thank you to all panelists. The case is argued to be made for a decision by the court that concludes our calendar for today. We'll be in recess until 1st, 3rd, and 8th of tomorrow morning.
judges: Rawlinson, Bybee, Beistline